William R. Bennett, III
Noe S. Hamra
BLANK ROME, LLP
1271 Ave. of the Americas
New York, NY 10021
212.885.5152
William.bennett@blankrome.com
Noe.hamra@blankrome.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| WILMAR SUGAR PTE. LTD., | : |
| Plaintiff, | : Case No. 1:24-cv-05347 |
| -against- | : |
| PIERRE JEAN CHIARADIA and | : |
| FREEPOINT COMMODITIES, LLC | : **COMPLAINT** |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff Wilmar Sugar Pte. Ltd. ("Wilmar") by and through its attorneys Blank Rome

LLP, for its complaint against Defendants Pierre Jean Chiaradia ("Chiaradia") and Freepoint

Commodities, LLC ("Freepoint") (collectively together "Defendants") alleges as follows:

## NATURE OF THE ACTION

1.      This case concerns Defendants' willfully false and intentionally damaging written

statements about Wilmar's business and operations.

2.      Plaintiff and Defendants operate in the international sugar industry, which market

is set by the Intercontinental Exchange ("ICE" or "Exchange"), and where disputes are resolved

in New York, New York.

3.      In February 2024, Defendants maliciously spread a rumor within the sugar industry that Wilmar had been forced by regulators to liquidate its March 2024 contract position due to market limit breach.

4.      This rumor was patently false and affected market movement which impacted Wilmar's profits.  The rumor also negatively affected Wilmar's reputation in the industry and within the ICE.

5.      Defendants' damaging statements have put Wilmar's name and reputation at stake and cost it significant damage in the market.

## THE PARTIES

6.      Wilmar is a Singaporean company with its principal place of business located at 28 Biopolis Road, Singapore. Wilmar operates worldwide as a global agricultural manufacturing company and is among the world's top ten raw sugar producers.

7.      Upon information and belief, Defendant Freepoint Commodities LLC is organized under the laws of Delaware and registered to do business in New York with its principal place of business located at 58 Commerce Rd, Stamford, CT 06902. Freepoint Commodities LLC is a commodity trader.

8.      Upon information and belief, Defendant Pierre Jean Chiaradia is employed by Freepoint as a sugar trader.

## JURISDICTION AND VENUE

9.      The Court has personal jurisdiction over Freepoint and Chiaradia, as the corporate defendant has an office in New York.

10.     ICE, which manages the market through which sugar is traded, operates in the State of New York.

11.    Chiaradia and Freepoint have committed tortious acts in New York as set forth herein, causing injury to Wilmar.

12.    The Court's jurisdiction over the parties does not offend traditional notions of fair play and substantial justice.

13.    Venue is proper under CPLR 503 because the center of gravity of all of the events is New York, New York.

## **BACKGROUND**

14.    The sugar market is fast-paced and can be drastically affected by market conditions, specifically with respect to future contracts with physical delivery, such as the NY#11 Sugar.

15.    When future contracts get to the last month before expiration, market participants that wish to have a market limit above the general limit must seek approval for a Hedge Exemption granted by ICE.

16.    Once granted, this Hedge Exemption defines the new market limit authorized by ICE to a company.

17.    In case of any breach made by the company to respect the market limit granted, ICE has the power to intervene and force the company to adjust its position in order to comply or full close the position for market breach.

18.    The process of obtaining a Hedge Exemption is very strict and precise based on disclosures and compliance with market regulatory limits under which all market participants are governed.

19.    Rumors, innuendo, and false statement in the marketplace can affect a party's position.

20.    Brokers and customers regularly utilize the chat app "WhatsApp" to exchange information and fix deals.

21.    On or about February 22, 2024, Wilmar was made aware of a rumor that Wilmar had been asked by regulators to liquidate 50% of its position.  This information was shared with Wilmar by a concerned client of Wilmar.

22.    The client shared WhatsApp correspondence which stated as follows:

> [H]earing related to limit breach at the exchange/exemption limit .. told to get out.. not sure how true that is, but imagine making a big loss
> Paper hitting the back spreads again – K5N5 drops 6 pts on 700x ..
> if this exemption limit story has some sort of validity to it, they gotta get out of H I guess, and HK will probably fly.. wondering if they are trying to mitigate against this by hammering the backs, if it is indeed the same person (commercial pos limit = 5,000 as an indic).

23.    When asked where "this hedge exemption limit debacle is coming from," the response was:

> Not sure …, but mkt wise, a few people are talking about it from TH [Trade House] to spec
>
> * * *
> Came from spec.. but couple of th have been saying the same thing
> No idea who started the rumour, but its something the mkt are voicing
>
> Exemption limit or not, HK is bid into strength and weakness, so shorts definitely rolling and/or covering
>
> Will see come expiry

24.    When the client expressed that it seemed "a bit reckless to be spreading" such a rumor, the response:

> From one person sure, but when several people are saying it
> Think of value no
> I mean no one really knows, but if you're the last to find out …

25.     Practically, a request from regulators as noted in the above chat – which was false – would indicate that an entity had reached the Hedge Exemption limit set by the Commodity Futures Trading Commission ("CFTC"). Because no granted limits can be exceeded without Exchange approval, a false rumor can damage a party's reputation with the Exchange and the market, causing financial and reputational harm.

26.     On February 23, 2024, an independent analyst, negligently or intentionally perpetuated the rumor via WhatsApp, stating:

> Wilmar is interested in delivering this time - they want to repeat the same game before receiving NY11 V23 and selling it to China - but Wilmar only has 500k maybe 600k mt of raws, not more than that.. so either we see strong HK buying or they will end up short delivering by 500k mt (market holded well , H-K structure quite stable)
>
> ...still with this bearish position they have - there is doubt if there is not enough business for their refineries or if they really think (**or try to manipulate**) prices will go back to 20c/lb or lower after Mar expiry betting on huge Brazilian availability in May and July! They received NY11 V 2023 contract big times (almost 2.76 mil mt) - very expensive at 26.27c/lb back then (they say they still have some volume). So dumping sugar at the H tape means they think they can buy later cheaper sugar. They would definitely receive May or Jul and Oct or all of them! If they manage to receive cheaper the further NY11 expiries then they can probably supply China govt for in-quota imports (15% duty) - otherwise if NY11 prices strengthen EVERYTHING WILL GO AGAINST THEM

27.     After investigation and exercising extreme due diligence, it was learned that the false rumor was started by Chiaradia who, along with others at Freepoint and elsewhere, conspired to harm Wilmar's reputation and financial position in the sugar market.

28.     On February 22, 2024, another broker, Societe Generale ("SocGen") published a daily report acknowledging the false rumors stating, in relevant part:

> There were rumors emanating from one broker that the largest Mch short was being force liquidated by the exchange, which we know

to be false. There is a large difference between typical adjustments during the final week of an expiration, and forced liquidation.

We are mentioning this only because the rumor seemed to be prevalent on the day, which may have contributed to some of the price gyrations.

29.     SocGen, which is not affiliated with Wilmar, independently confirmed that the market may have been affected by the negative rumors regarding Wilmar.

30.     The false and malicious rumor was spread on February 22, 2024. On the days prior, the spread H4-K4 and the H4 Future contact were rather declining, respectively H4-K4 traded between 45 to 55 points and the H4 Future contract settled at 22.77 cents per pound.

31.     On February 22, 2024, at time of the false rumor, the H4-K4 spread started to spike from 49 points to 67 points, or a 37% increase price in a day. The following days, the spike drastically continued, and the spread went up to 129 points within the next three trading days, an increase of nearly 100%, which is quite unusual. Similarly, the H4 future contract price moved from 22.77 cents per pound to 24.04 cents per pound within the three days following the false rumor.

32.     Only after the fourth day, when the news started to be understood as completely false, prices reversed. The H4-K4 spread, after reaching 137 points, crashed to 80 points in a day. Similarly, H4 Futures contract, after reaching 24.16 cents per pound on February 28, 2024, dropped to 22.50 cents per pound.

33.     Wilmar was to deliver 1,146,149 metric tons of sugar on the H4 contract. The false rumor triggered a spike as described above on H4-K4 spread and H4 Future contract that affected prices and market participant position adjustments. The rumor also misled market participants' trading decisions, incentivizing them to maintain longer long positions in the hopes of squeezing Wilmar and forcing the Exchange to cut Wilmar's market position.

34.    As a direct result of the false rumors, Wilmar's position was prejudiced, resulting in damages estimated to be no less than $22,742,496.    Meanwhile, Defendants financially benefitted from their bad acts.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Defamation *per se* – Freepoint and Chiaradia)

35.    Plaintiff repeats and re-alleges paragraphs 1–34 above as though fully set forth herein.

36.    Defendant Chiaradia, as an employee of Freepoint, without privilege or permission, published false statements about Wilmar to members of the sugar trade, including potential customers and brokers of Wilmar.

37.    Defendant Chiaradia, as an employee of Freepoint, made such statements with knowledge of their falsity or in reckless disregard as to whether such statements were true or false and to intentionally injure Wilmar.

38.    Defendant Chiaradia, as an employee of Freepoint, acted with actual malice when he made statements about Wilmar and encouraged others to repeat such statements.

39.    Statements made by Chiaradia in the context of his employment by Freepoint were defamatory *per se*, as they cast doubt on Wilmar's business integrity and have no basis in truth.

40.    The statements written by Chiaradia as an employee of Freepoint affected the sugar market, which cost Wilmar actual damages in an amount to be proven at trial.

41.    The statements written by Chiaradia as an employee of Freepoint also affected Wilmar's reputation, which cost Wilmar reputational damages in an amount to be proven at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Defamation *per se*)

42.    Plaintiff repeats and re-alleges paragraphs 1–41 above as though fully set forth herein.

43.    Statements written by Defendants were defamatory *per se*, as they cast doubt on Wilmar's business integrity and have no basis in truth.

44.    The statements written by Defendants affected the sugar market, which cost Wilmar actual damages in an amount to be proven at trial.

45.    The statements written by Defendants also affected Wilmar's reputation, which cost Wilmar reputational damages in an amount to be proven at trial.

## AS AND FOR A THIRD CASUE OF ACTION
### (Negligence – Chiaradia and Freepoint)

46.    Plaintiff repeats and re-alleges paragraphs 1–45 above as though fully set forth herein.

47.    Statements written by Chiaradia as an employee of Freepoint were knowingly defamatory *per se*, as they cast doubt on Wilmar's business integrity and have no basis in truth.

48.    Chiaradia and Freepoint had a duty not to disseminate false rumor and innuendo with the sugar market.

49.    The statements affected the sugar market, which cost Wilmar actual damages in an amount to be proven at trial.

50.    The statements also affected Wilmar's reputation, which cost Wilmar reputational damages in an amount to be proven at trial.

51.    Chiaradia and Freepoint, by and through their negligence caused, permitted, allowed and consented to the dissemination and distribution of knowingly false statements about Wilmar which caused harm to Wilmar.

52.     Chiaradia and Freepoint, however, financially benefitted by manipulating the market.

**WHEREFORE**, Plaintiff demands judgment in their favor as against the Defendants and requests that the Court award Plaintiff: (i) damages for financial losses in an amount not less than $22,742,496; (ii) damages for reputational harm in an amount not less than $15,000,000; (iii) prejudgment interest and post-judgment interest; (iv) reasonable attorneys' fees; and (v) such other and further relief as the Court deems just.

Dated:  New York, New York
       July 16, 2024

**BLANK ROME LLP**

By: *William R. Bennett III*
William R. Bennett
Noe S. Hamra
1271 Avenue of the Americas
New York, New York 10020
(212) 885-5000
William.Bennett@blankrome.com
Noe.Hamra@blankrome.com

*Attorneys for Plaintiff Wilmar Sugar Pte. Ltd.*